**Application of Orville Leonard MAGELI et al.**

**Patent Appeal No. 8799.**

United States Court of Customs and Patent Appeals.

Jan. 18, 1973.

Alan L. Potter, Washington, D. C., Earl L. Tyner, Arlington, Va., Plumley & Tyner, Arlington, Va., attorneys of record, for appellants.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, ad-

1. Reg. No. 829,994 issued June 6, 1967.

2. Reg. No. 643,012 issued March 19, 1957.

hered to on reconsideration, affirming the examiner's rejection of the sole claim in appellants' application, serial No. 536,618, filed March 23, 1966, for obviousness under 35 U.S.C. § 103. We affirm.

### The Subject Matter Claimed

The claim on appeal is for the compound "Di-secondary-butylperoxydicarbonate," which we shall refer to as SBP. The application teaches that this ester is useful as an initiator of polymerization reactions of olefinically unsaturated monomers such as styrene, vinyl chloride, and ethylene. It further teaches that SBP is allegedly less susceptible to spontaneous decomposition and is less shock sensitive than prior art lower alkyl peroxydicarbonate esters useful for the same purpose.

### The References

The references are:

| Strain | 2,370,588 | Feb. 27, 1945 |
| Friedlander | 2,728,756 | Dec. 27, 1955 |
| Strain et al., | Journal American Chemical Society, | |
| | Vol. 72 (1950), pages 1254–1263 | |

There is essentially no dispute about the teachings of the references. Appellants succinctly sum up the prior art as follows:

The cited references disclose three isomers and an adjacent homologue of the claimed compound, and disclose that these compounds have utility as polymerization initiators. The particular isomers disclosed are N-butyl peroxydicarbonate, isobutylperoxydicarbonate, and tertiary butylperoxydicarbonate, referred to as NBP, IBP and TBP respectively. The adjacent homologue disclosed is isopropyl peroxydicarbonate (IPP).

The Strain reference discusses methods of producing peroxydicarbonates, and discloses methyl ethyl carbinol * * * as a possible starting material. This compound, if reacted in the manner disclosed in the Strain reference, would result in the instantly claimed compound.

### The Rejection

The examiner held and the board agreed that the claimed compound, SBP, would have been obvious to one of ordinary skill in the art in view of the close structural similarity of SBP to several prior art compounds, also known to be polymerization initiators, the board specifically referring to the teaching of Strain "indicating how the claimed compound may be made, and the disclosure of closely related specific isomeric compounds * * *."

Appellants filed two successive affidavits in an attempt to show unexpected superiority of SBP over the prior art isomers and homologue (NBP, IBP, TBP, and IPP) as polymerization initiators, with greater solubility in hydrocarbon solvents, greater safety in handling due to greater stability at room temperature, and less shock sensitivity. The second affidavit also included evidence of alleged commercial success of appellants' compound under the trade name "Lupersol."

The examiner was not impressed with appellants' evidence because, as he said,

* * * it is noted that the instant compound is superior to some of its isomers in some respects, and inferior to some of its isomers in other respects. Further, data on only a few of a large number of possible tests are presented, e. g. the efficiency of the various peroxides with respect to dozens of other polymerizations could be determined. Moreover, variations in the characteristics of the isomers are reasonably to be expected in view of the teachings of Strain et al that differences in stability are dependent upon choice of alkyl groups * * *. Thus one skilled in the art would expect variations in properties among the various butyl isomers because of their structural differences.

The board adopted the above examiner's reasons and, in addition, stated, with

respect to the differences in properties of the different isomers, that:

> Appellants point out that there are differences in the properties of the different isomers. Such differences would be expected by those skilled in the art and while they may not be precisely predictable, nevertheless, the close relationship to the isomers in the art cited and the clear teaching by Strain of how to make the claimed isomer, in our opinion, renders the claimed isomer obvious under 35 U.S.C. 103.

In addition, the board said it had considered the commercial success evidence and stated that "we do not consider the affidavit persuasive of patentability. Commercial success is of no moment unless patentability is in doubt, National Machine Products Co. v. Ladd, 231 F.2d [sic. Supp.] 535, 142 USPQ 254 [(D.C. D.C.1964)]."

## OPINION

We agree with the Patent Office Solicitor that the claimed compound is prima facie obvious from the teachings of the prior art as a whole and there is no need to discuss this point since appellants do not contest it. Their case is that prima facie obviousness has been overcome. As they state in their brief,

> In so far as the Board bases its finding of obviousness upon the prior art showings of certain isomers and a homologue, it is submitted that the clear-cut showing of unexpected and superior properties of the claimed compound put this application squarely within the doctrine of In re Papesch, 50 CCPA 1084 [315 F.2d 381], 137 USPQ 43 [1963].

As the solicitor's brief accurately points out,

> The appellants rely for patentability on evidence allegedly showing (1) "unexpected and superior properties", (2) that "the instant invention filled a long sought need", and (3) "almost instantaneous commercial success" although the applicable prior art "had been available for 15 to 20 years" * * *.

The balance of the solicitor's brief is devoted to answering those points, we think successfully.

■ We shall consider point (3), the commercial success argument. At the outset, we correct the board's reference to the opinion in the *National Machine Products* case. Judge Jackson's opinion therein did not say commercial success is of "no moment unless patentability is in doubt," the proposition for which it was cited. Judge Jackson actually said (our emphasis):

> Since the Court does not find the issue of obviousness otherwise in doubt, this evidence can be accorded only *slight probative weight.* Union Metal Mfg. Co. v. Ooms, 81 U.S.App.D.C. 76, 154 F.2d 857 (1946).

It must be pointed out that Judge Jackson was writing nearly two years before Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), which provided new guidance in the matter of determining patentability under the 1952 Act. As illustrating how far we have come in our thinking on that matter in a quarter century we quote, on a res ipsa loquitur basis, the following from the *Union Metal* per curiam opinion which was cited by Judge Jackson, a pre-1952 Act case typical of the kaleidoscopic reasoning which was not uncommon before the 1952 Act sorted out the prerequisites to patentability (emphasis ours):

> These claims were denied patentability * * * on the ground that they do not disclose invention over the prior art * * *. In our opinion, the *novelty* necessary to show *inventime genius* is lacking in these claims. * * * the lower court's findings of fact * * * clearly show that the device had been *anticipated.*
>
> The appellants proved the *utility* of their product as a cargo boom, and its

widespread acceptance by the shipping industry as a *useful* device. But a plain *absence of invention* is not overcome by evidence of usefulness and commercial success. Only where there is doubt as to *invention or novelty* is proof *of practical utility* and general *commercial acceptance* permitted to turn the decision in favor of patentability. * * * neither claim recites anything amounting to *invention* over the prior art. That being true, commercial success does not supply the lacking invention. [81 U.S. App.D.C. at 76–77, 154 F.2d at 857–858.]

Suffice it to say that we have long since outgrown that kind of reasoning in the field of patent law and gone with it are doubts about the necessity of considering the evidence of relevant facts. Obviousness or unobviousness under § 103 being an ultimate legal conclusion to be determined on the basis of facts established by evidence, evidence bearing on the facts is never of "no moment," is always to be considered, and accorded whatever weight it may have. In re Palmer, 451 F.2d 1100, 59 CCPA —— (1971), and cases cited therein.

Appellants argue that "The Board has * * * failed to recognize that the instant invention filled a long sought [sic] need, and met with almost instantaneous *commercial success as soon as it was made available* * * *." The long-felt need argument here is predicated on the knowledge of the art that *all* of the peroxydicarbonates here involved are unstable, decomposing in a short time at room temperature, decomposition being exothermic and tending, in some cases, to be explosive. Appellants' specification provides this information:

Table III

| Peroxydicarbonate | Time of decomposition |
|---|---|
| | [at 21° C] |
| IPP | 13 minutes |
| IBP | 16 minutes |
| SBP [the invention] | 150 minutes |

That is impressive but not persuasive because it is also the fact, as shown by the references and admitted by appellants, that the prior art TBP does not decompose at room temperature for at least 180 minutes. There could not have been a long search for a peroxydicarbonate *as* stable as SBP because a *more* stable compound was available. It therefore does not even appear that there was a felt need for a more stable dicarbonate. Appellants attempt to counter the significance of the prior art TBP on this score by contending (1) that twice as much TBP as SBP is required as an initiator and (2) that TBP "could not be practically produced on a commercial scale according to the preparation methods of record in this application." As to (1), they rely on a single series of tests polymerizing vinyl chloride at a single temperature, the difference in amount being between 0.029 phr for SBP (as well as for NBP and IBP) and 0.057 phr for TBP ("phr" = parts of peroxide per) hundred parts of monomer). While the solicitor's brief points to many factors showing that this difference in amount lacks significance, we think it sufficient to note that appellants' own specification says that the concentration of SBP "may, in general, be varied between about 0.001 and about 1% by weight" based on the weight of the monomer, with "more or less catalyst" employed depending on a variety of operating conditions and the polymer product desired. The figures, moreover, were not obtained from commercial operations but from one series of laboratory tests performed to get data to overcome the rejection.

As for point (2), the alleged commercial impracticability of producing TBP, the affiant on whose statement reliance is placed speaks only of "the preparation of TBP as disclosed in Friedlander," the reference patent which discloses TBP, application for which was filed in 1952. In effect, all affiant was saying in 1969 was that Friedlander's method would not be practical on a commercial scale and that in commercial production there would be problems. He does not say there would not be other ways of making TBP or that the production problems could not be solved. The affiant's brief statements of mere opinion on this score

do not materially aid the argument that there was in fact a long-felt need filled by the invention.

Turning to the alleged "instantaneous commercial success," we have for consideration but two pages of an affidavit by a Dr. Light who was a group leader in charge of the Polymer Group of the LUCIDOL Division of Wallace & Tiernan, Inc., assignee of the present application. Dr. Light, "at the request of Patent Counsel, contacted the Commercial Chemical Development Department of the LUCIDOL DIVISION" for sales figures on SBP and then reported them in his affidavit. SBP (99% pure) is sold as LUPERSOL 225 and in the form of a 75% solution in mineral spirits it is sold as LUPERSOL 225M. He presented his hearsay sales information as follows:

Sales in Pounds

| Year | LUPERSOL 225 | LUPERSOL 225M |
|------|--------------|---------------|
| 1966 | * | * |
| 1967 | 240 | 9,100 |
| 1968 | 3,400 | 41,200 |
| 1969 | 38,000 | 102,500 |

Since the affidavit was made February 26, 1969, the figures for 1969 are mere estimates. Disregarding the hearsay aspect of the sales figures of 1967–68, the most they show is that Wallace & Tiernan, having put these products on the market, enjoyed substantial sales for undisclosed reasons. Dr. Light expresses some opinions about the sales being due to the merits of SBP and about its having made inroads on the use of IPP, which he said was the only peroxydicarbonate commercially available to the plastics industry, the product admittedly having a "large" use. But, for all the record shows, the sales could have resulted from a large advertising campaign, price concessions to get the product moving, or purchases by an affiliate or controlled company rather than from the advantageous attributes of the claimed compound. This kind of conclusionary, opinion, hearsay evidence is entitled to little weight. We have no idea of the size of the market, e. g., the annual consumption of IPP. We are told, however, that "one of the reasons for the expected enormous increase in the 1969 sales for LUPERSOL 225M is that *one large user* of IPP * * * is replacing IPP with LUPERSOL 225M for reasons of safety, and also its greater solubility in *their particular* polymerization system." (Emphasis ours.) For all the record shows, SBP may have been made available because it was what this one large user wanted for its particular process.

In sum, this is not the *kind* of a commercial success story that is persuasive of the unobviousness of this compound, SBP, to those of ordinary skill in the art. We turn now to the other argument based on the alleged presence in SBP of *unexpected* advantageous properties, appellants' "superiority" argument.

By admission, the prior art contains very closely related compounds, three isomers and an adjacent homologue, all of which are known in the art as polymerization initiators, the principal property of concern here. The adjacent homologue is IPP, the one peroxydicarbonate which appears to have been commercially available to, and in "large" use by, the industry as an initiator when appellants first produced SBP. As would be expected, SBP and the prior art related compounds have many characteristics in common, such as their utility as initiators, their instability, their shock sensitivity, etc. The prior art discloses how to make the compound of the invention, SBP. There is, therefore, a very strong case of prima facie obviousness.

■ Appellants rely on the superiority of SBP in certain specific properties. The first is its *longer* decomposition time when compared to *three* of the four prior art compounds at 21° C., namely, IPP, IBP, and NBP, which decompose at 13, 16, and 17 minutes respectively, as against 150 minutes for SBP. Unobviousness, however, cannot be predicated

---

* No sales, sampled to potential customers free of charge.

on superiority alone. Obviousness depends on what those skilled in the art would *expect*. As the examiner pointed out in his final rejection, the decomposition time of SBP falls within the range of what was known since the fourth prior art compound, TBP, has a decomposition time of 180 minutes. He further pointed out in his Answer that the Strain et al. article taught in 1950 "that differences in stability are dependent upon choice of alkyl groups * * * and upon the size of these groups * * *. Thus one skilled in the art would expect variations in properties among the various butyl isomers because of their structural differences." It may clarify the closeness of the relationship of the invention to the prior art and the expectedness of the longer decomposition time of SBP relative to the three isomers to set down side by side, by their chemical names, TBP and SBP:

Prior art: Di-tertiary-butyl peroxydicarbonate, 180 minutes
Invention: Di-secondary-butyl peroxydicarbonate, 150 minutes

With respect to longer decomposition time it appears to us that this case does not even present a superiority situation, to say nothing of unexpectedness.

Appellants mention two other properties of SBP, namely, better shock sensitivity and low-temperature solubility in certain solvents but, again, their brief argues this superiority only with reference to two of the prior art compounds, the isopropyl (IPP) and isobutyl (IBP) peroxydicarbonates, and refers only to the specification for support. We can give no weight to this in the absence of comparison with more closely related compounds.

Having carefully considered all of the evidence presented to overcome the strong prima facie case of obviousness established by the prior art references, our conclusion is that appellants have not succeeded in overcoming it and the decision of the board is therefore affirmed.

Affirmed.